# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **MONROE FIREFIGHTERS ASSOCIATION, ET AL.** | **CIVIL ACTION NO. 06-CV-1092** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **CITY OF MONROE** | **MAG. JUDGE KAREN L. HAYES** |

## <u>RULING</u>

This action was brought on June 27, 2006, by approximately 148 former and current firefighters, who allege that their employer, the City of Monroe (the "City"), committed certain violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"). In this, the third of five dispositive motions, the City filed a Motion for Partial Summary Judgment ("Third Motion for Partial Summary Judgment") [Doc. No. 62] on Plaintiffs' claims of FLSA retaliation.

Plaintiffs have filed a memorandum in opposition to the City's Third Motion for Partial Summary Judgment [Doc. No. 109].

With leave of Court, the City filed a Reply memorandum [Doc. No. 121].

Having reviewed all briefs filed and evidence submitted, the Court finds that the City's Third Motion for Partial Summary Judgment should be GRANTED IN PART and DENIED IN PART.

## I. FACTS[1]

On November 4, 2005, Perry Jeselink ("Jeselink"), the President of the Monroe Firefighters Association ("the Union"), and Tim Dickerson ("Dickerson"), the Vice-President of the Union, met with Fire Chief Jimmie Bryant ("Chief Bryant"); Chief Bryant's secretary, Barbara Ryals ("Ryals"); Mike Rhymes ("Rhymes"), the Human Resources Director for the City; and David Barnes ("Barnes"), the Director of Administration for the City. At the meeting, the City allegedly conceded that it was calculating longevity pay incorrectly. The parties also discussed the calculation of overtime compensation. However, they did not reach an agreement on the overtime issue.

On January 18, 2006, Plaintiffs' counsel sent a letter to the City requesting an explanation of the calculation of overtime compensation. The City did not respond.

On February 13, 2006, Plaintiffs' counsel faxed another letter to the City, attaching the January 16, 2006 letter.

On April 11, 2006, Chief Bryant changed the policy of the Monroe Fire Department ("MFD") on "time trading." Time trading occurs when firefighters exchange shifts. Because firefighters often hold second jobs, they rely on time trading to schedule their second jobs.

On May 1, 2006, Chief Bryant transferred the Union President (Jeselink), Vice-President (Dickerson), and Secretary/Treasurer (Randall McConaughey). Chief Bryant states that he did so because of their attitude.

On May 2, 2006, Chief Bryant informed the Union, via a memorandum, that it could no longer hold meetings at Fire Station #1, where they had been held for as long as anyone could

---

[1]The facts are discussed more fully in the analysis of each claim. The facts in this section are provided to give a timeline and context for the more detailed discussion below.

remember.  However, he never actually forced the Union to move their meetings.

On June 8, 2006, Plaintiffs' counsel sent another letter to the City with a draft of the original Complaint in this matter.

On June 26, 2006, Plaintiffs filed their Complaint [Doc. No. 1].

On July 20, 2006, Chief Bryant mandated that all personal furniture and appliances (which would include microwaves and televisions) be removed from the fire stations.

On August 22, 2006, Chief Bryant allegedly told Jeselink that the Union was jeopardizing its contract by pushing "these issues." [Doc. No. 109, Exh. 24, Jeselink Declaration].  Of the approximately 190 employees of the MFD, about 150 employees are members of the Union. Every Union member is a plaintiff in this lawsuit.

In the August 2006 edition of "The Big Blaze," MFD's newsletter, Chief Bryant wrote the following in the "Chief's Notes" section:

> However, there are other matters brewing before us which do not accurately portray the **image or spirit** of our organization.  Sometimes when information is added or taken away it changes the whole meaning of an issue.  Please know that this office and administration has and will support its members to the best of its ability.  However, even in a twenty year marriage differences arise.  You manage them by working through them.  We should never condone **Political Morale Busting** and **Character Assassination**.  We cannot make decisions based on how one or two individuals feel about it.  Nor will I make it a practice of getting permission before decisions are made.

[Doc. No. 109, Exh. 1, Chief Bryant Depo., Exh. 1].

Around this time, Chief Bryant does not remember calling Jeselink and Dickerson "motherfuckers" and "chicken shit sons of bitches" or referring to the "motherfucking union," but cannot deny it either.  [Doc. No. 109, Exh. 1, Chief Bryant Depo., p. 79].

On August 24, 2006, the City filed a counterclaim against Plaintiffs, seeking $980,000.00 for "payment of a thing not due" under La. Civ. Code arts. 2299 and 2300.

On September 18, 2006, Chief Bryant "locked down" the fire stations, so that firefighters could leave the fire stations only for emergency calls. Firefighters are not permitted to leave for any other reason during their shifts, even for groceries or meals.

In December 2006, prior to the civil service hearing, the firefighters' Civil Service Representative, Daniel Booth ("Booth"), asked Chief Bryant when he was going to stop punishing him. Chief Bryant allegedly asked Booth if he was referring to the lock down. When Booth indicated that he was, Chief Bryant said that he "'did that in retaliation of the union' or words to that effect." [Doc. No. 109, Exh. 12, Booth Depo., Depo. Exh. 3]. Chief Bryant allegedly admitted that he was "wrong," but wanted "to change some things before [he] let the trucks loose again." [Doc. No. 109, Exh. 12, Booth Depo., Depo. Exh. 3].

On October 2, 2006, Chief Bryant relaxed the time trading policy.

On January 3, 2007, Chief Bryant lifted the lock down, but, a week later, on January 10, 2007, he imposed some restrictions on firefighters' movements, such as prohibiting them from having a meal in a restaurant after 3:00 P.M. [Doc. No. 109, Exh. 31, Doc. #00038 produced by the City].

In a January 26, 2007 memo to Mayor Jamie Mayo, Chief Bryant wrote that "it must be understood that happy employees are not always productive workers." [Doc. No. 109, Exh. 31, Doc. #000001-000002 produced by the City].

In a June 26, 2007 memo, Chief Bryant stated that the MFD would begin strictly

enforcing its sick leave policy.

On January 15, 2008, Plaintiffs filed their Third Amended Complaint, identifying eight acts of retaliation:

1) Running criminal background checks on firefighters;

2) Prohibiting firefighters from trading shi[f]ts which interferes to a large degree with some firefighters' second jobs;

3) Forcing firefighters to "step-up" or work shifts in place of a higher ranking member of the fire department;

4) Limiting the number of firefighters who may leave the station during each shift;

5) Prohibiting on-duty [firefighters] from attending union meetings;

6) Forcing recently retired firefighters to forfeit earned vacation;

7) Transfers of the Union president, vice-president, and secretary-treasurer to less desirable job locations[; and]

8) Attempting to rescind the applicable Collective Bargaining Agreement.

[Doc. No. 41, ¶ 20].


## II.    LAW AND ANALYSIS

### A.    Standard of Review

"Summary judgment is appropriate [if the summary judgment evidence shows] 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Mello v. Sara Lee Corp.*, 431 F.3d 440, 443 (5th Cir. 2005) (quoting Fed. R. Civ. P. 56).

If the moving party will bear the burden of persuasion at trial, that party must support its

motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit credible evidence that negates the existence of some material element of the opponent's claim or defense, or (2) demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Id.* If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). "The nonmoving party, however, 'cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Id.* (quoting *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)).

### B.       Retaliation under the FLSA

Section 215(a)(3) of the FLSA provides, in pertinent part, that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3); Pub. L. 99-150, 99 Stat. 791 (Nov. 13, 1985) (extending the protection of the anti-retaliation provision to public employees); *see also James v. MedicalControl, Inc*., 29 F.Supp.2d 749 (N.D. Tex. 1998) (The FLSA "prohibits retaliation against an employee who files a complaint, initiates proceedings, or assists in the initiation of proceedings under the FLSA.").

An employee asserting retaliation under the FLSA may proceed in one of two ways: by direct or circumstantial evidence.

"Direct evidence" is "evidence which, 'if believed, proves the fact [in question] without

inference or presumption.'" *Fabela v. Socorro Ind. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003)

(quoting *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994)). In direct evidence cases, the

plaintiff must submit evidence "that retaliation was among the motives which promoted the adverse

action."[2] *Fabela*, 329 F.3d at 409. Such "evidence includes any statement or document which

shows on its face that an improper criterion served as a basis-not necessarily the sole basis, but a

basis-for the adverse employment action." *Id.* (citations omitted). If the plaintiff meets this burden,

then the "burden of proof shifts to the employer to establish by a preponderance of the evidence that

the same decision would have been made regardless of the forbidden factor." *Id.* at 415. (internal

quotation marks and citations omitted).

If a plaintiff does not have direct evidence of retaliation, then his claim is analyzed under

the traditional burden-shifting framework of *McDonnell Douglas*. *See Kanida v. Gulf Coast Med.*

*Personnel LP*, 363 F.3d 568, 577 (5th Cir. 2004) (noting retaliation claims under the FLSA are

subject to the Title VII *McDonnell Douglas* burden-shifting analysis). To establish a claim of

retaliation under this method, a plaintiff must demonstrate that he: (1) engaged in a protected

activity; (2) that an adverse action occurred; and (3) that a causal link exists between the protected

activity and the adverse action. *Fabela*, 329 F.3d at 414; *see also Moran*, 2007 WL 3256571, at *2

(citation omitted); *James*, 29 F.Supp.2d at 752. If plaintiff meets his initial burden, the burden of

production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse

---

[2]Although the Fifth Circuit has not specifically addressed the method of presenting direct evidence of retaliation under the FLSA, the Court uses the method set forth in *Fabela* in the context of a claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, *et seq.* 329 F.3d at 415. "The retaliation provision of the FLSA uses language nearly identical to that of Title VII. Consequently, decisions interpreting Title VII are instructive in cases involving the FLSA." *Moran v. Ceiling Fans Direct, Inc.*, Civil Action No. H-06-0813, 2007 WL 3256571, at *5 n.1 (S.D. Tex. Nov. 5, 2007).

employment action. If the defendant meets its burden, the burden of proof shifts to the plaintiff to show that the reason is unworthy of credence or is pretext for retaliation. *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008).

Plaintiffs assert that they have both direct and circumstantial evidence of retaliation. They rely on the direct method to prove that the City engaged in alleged acts of discrimination by rescinding the collective bargaining agreement ("CBA") between it and the Union and by Chief Bryant's decision to "lockdown" all firefighters at the fire station during their shifts. Alternatively, Plaintiffs contend that they can establish, via the *McDonnell Douglas* test, that the City is liable both for these actions and Chief Bryant's April 11, 2006 restriction of time trading.

The City argues that Plaintiffs have failed to present direct evidence of retaliation. Under the circumstantial evidence test, the City argues that Plaintiffs have failed to establish that they were subjected to materially adverse actions and that those actions were causally connected to their protected activities. The City also contends that Plaintiffs have no evidence to support one of the claimed acts of retaliation and that another act was never properly alleged.

### 1.      Direct Evidence

Plaintiffs rely on the following statements as direct evidence of retaliation:

•      On August 22, 2006, Chief Bryant stated to Union President Jeselink that "the Union is jeopardizing its contract by pushing these issues."

•      In December 2006, Chief Bryant stated that "he had 'locked down' the firefighters, restricting their ability to leave the fire station for groceries or meals 'in retaliation to the Union' or words to that effect."

•      After the lawsuit was filed, Ryals told a firefighter, Bryan Boudreaux, that he "was going to regret having my name on the lawsuit list . . . involving the Chief."

[Doc. No. 109, pp. 8-9, Exhs. 1, 12, & 34].

The City contends that neither of Chief Bryant's statements constitute direct evidence of discrimination and that Ryals's statement is not that of a supervisor and, thus, not attributable to the City.

The Court finds that neither Chief Bryant's August 22, 2006 statement nor Ryals's statement to Boudreaux is direct evidence of retaliation. Neither statement shows on its face that an improper criterion served as at least part of the motivation for an adverse action. Ryals's statement, even if attributable to the City, is nothing more than an empty threat without a tie to any specific action taken by the City. Further, as the City notes, Ryals was not a supervisor, nor did she speak on a matter over which she held the authority or ability to act for the City.[3] Chief Bryant specifically referred to the Union contract or CBA in his alleged August 2006 statement, but a jury would have to infer that the City Council's action in rescinding and refusing to reinstate the CBA more than one year later, in October 2007, was tied to Chief Bryant's expressed animus. The fact that Plaintiffs had to explain the circumstances surrounding the City's rescission and failure to reinstate the CBA demonstrates that, while Chief Bryant's statement may be some circumstantial evidence of a retaliatory motive, it is not direct evidence.

However, Chief Bryant's remaining admission that he locked down the firefighters because of the Union's complaints is direct evidence of retaliation. The City contends that Booth's testimony is inadequate because he cannot recall Chief Bryant's exact words. Booth is clear that Chief Bryant admitted that he locked down the trucks and would not permit the firefighters to leave the stations because of the Union's actions, whether Chief Bryant specifically used the word

---

[3]For example, the Court would find Plaintiffs' argument more compelling if Ryals had threatened to use her position as Fiscal Coordinator to take a materially adverse action against Plaintiffs.

"retaliation" or not. Further, he does recall, specifically, that Chief Bryant said he was "wrong." This is enough evidence that retaliation was *a* basis, if not the sole basis, for Chief Bryant's lock down.

Because Plaintiffs have produced direct evidence that the lock down was retaliatory, the burden of proof (not production) shifts to the City to demonstrate that it would have taken the same action in the absence of the illegal motive. *Fabela*, 329 F.3d at 415. According to Chief Bryant's deposition testimony, he instituted a lock down policy to address problems with firefighters' personal use of fire trucks, their use of fire trucks without notifying dispatch, and their needless waste of fuel. [Doc. No. 62, Exh. 6, Chief Bryant Depo., pp. 70-73]. Thus, Chief Bryant disputes his alleged earlier admission with this testimony. The City also points out that the lock down applied to all firefighters, not just Plaintiffs.

The City also relies on evidence that, four months later, in January 2007, Chief Bryant relaxed the lock down, so that firefighters can leave their stations for food, but must get orders "to go" any time after 3:00 P.M. The firefighters may also now travel outside their district if there is no restaurant, as long as they get an order to go.

The Court finds that there is a genuine issue of material fact for trial on Plaintiffs' claim that the City retaliated against them by instituting a lock down. Although the City has produced a legitimate, non-retaliatory reason for the lock down and has since relaxed the restrictions, the Court cannot conclude as a matter of law that Chief Bryant would have instituted a lock down, even in the absence of the retaliatory motive. By his testimony, Chief Bryant essentially disputes what he allegedly admitted to Booth, which is a credibility determination for the jury. Further, the fact that the lock down applied to all firefighters is of no assistance to the Court when approximately eighty

percent of the MFD are members of the Union, and all Union members are Plaintiffs in this lawsuit.[4]  Accordingly, the City's Motion for Partial Summary Judgment on this claim is DENIED.

The Court now turns to Plaintiffs' remaining claims.

## 2.    Circumstantial Evidence

Plaintiffs' remaining claims will be analyzed under the *McDonnell-Douglas* framework. The Court finds, first, that Plaintiffs engaged in a FLSA-protected activity by raising FLSA "issues in January 2006" and by, ultimately, "filing . . . this lawsuit in June, 2006."[5]  [Doc. No. 62, p. 1]; *see Hagan*, 529 F.3d at 625-28 ("We adopt the majority rule, which allows an informal, internal complaint to constitute protected activity under [the FLSA]," but "not all abstract grumblings or vague expressions of discontent are actionable as complaints"; an employee "must do something outside of his or her job role in order to signal to the employer that he or she is engaging protected activity.") (internal quotation marks omitted).

However, the City contends that Plaintiffs cannot establish the remainder of their prima facie case because certain alleged acts of retaliation are not "materially adverse," and because Plaintiffs cannot show that there is a causal connection between their protected activities and the

---

[4]In this Motion for Partial Summary Judgment, the City has argued several times that the alleged acts of retaliation were applicable to all employees of the MFD.  While that argument is factually true, as a general proposition it is of little help to the Court's analysis of whether the City is entitled to summary judgment.  This case is not typical in many ways.  One difference is what the Court has pointed out:  eighty percent of the persons affected by these acts are Plaintiffs. Thus, if Chief Bryant (or others acting on behalf of the City) chose to retaliate against Plaintiffs, the jury may well infer that the other twenty percent of MFD employees were just collateral damage.  On the other hand, evidence that policies or acts, such as the telephone usage policy, applicable  to all employees of the City, not just the MFD, militates against such an inference without additional evidence.

[5]At least for purposes of summary judgment, the City concedes this point.

retaliatory acts alleged.

### a.      Materially Adverse Actions

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme

Court considered the "reach" of Title VII's anti-retaliation provision and the meaning of the terms

"discriminate against." *Id.* at 57.  Ultimately, the Supreme Court held as follows:

> We conclude that the anti-retaliation provision does not confine the actions and
> harms it forbids to those that are related to employment or occur at the workplace.
> We also conclude that the provision covers those (and only those) employer actions
> that would have been materially adverse to a reasonable employee or job applicant.
> In the present context that means that the employer's actions must be harmful to the
> point that they could well dissuade a reasonable worker from making or supporting a
> charge of discrimination.

*Id.* at 68 (internal quotation marks omitted).  The Court explained that "[t]he anti-retaliation

provision protects an individual not from all retaliation, but from retaliation that produces an injury

or harm," and noted that it "speak[s] of material adversity because . . . it is important to separate

significant from trivial harms."  *Id.* at 67-68.

The Court finds that certain of the alleged acts are not materially adverse and, thus, the City

is entitled to summary judgment on these claims.

### (1)      Prohibiting on-duty firefighters from attending union meetings

In their Third Amended Complaint, Plaintiffs list as one of the acts of retaliation that on-duty

firefighters were prohibited from attending Union meetings.  In discovery responses, Plaintiffs

identified several firefighters who were directly prohibited from attending Union meetings or who

were prevented from attending the meetings because of Chief Bryant's policy that only one truck

could be out in each district.[6]  *See* [Doc. No. 62, Exh. 1, Plaintiffs' discovery responses, Exh. E]. In their opposition memorandum to this Third Motion for Partial Summary Judgment, Plaintiffs list in the facts section that, on May 2, 2006, Chief Bryant informed the Union that it could no longer hold meetings at Fire Station #1, where the meetings had been held for as long as anyone could remember.

In his Declaration, Chief Bryant explains that he only "proposed" moving the Union meetings to another location because he believed that they were an inappropriate use of public property and interfered with the work of firefighters at Fire Station #1 (also called Central Station). [Doc. No. 121, Exh. 1, Chief Bryant Dec., ¶ 30].  However, because this was not a "critical" problem and the firefighters opposed any change, Chief Bryant did not move the location of the Union meetings; the Union continues to meet at Fire Station #1.

Chief Bryant originally also had a policy for a short time of not allowing on-duty firefighters to attend Union meetings unless the firefighters were assigned to Fire Station #1, where the meetings are held.  Chief Bryant testified that he passed the station during a Union meeting, and there were "trucks everywhere," even though there was a "tower rescue going on in West Monroe," so he called a Deputy Chief to deal with the situation.  [Doc. No. 62, Exh. 6, Rule 30(b)(6) Depo., pp. 94-95]. Union President Jeselink testified that the original policy "affected morale" and the ability of members to stay informed.  However, he admitted that the Union members who attended the

---

[6]Plaintiffs Robert Arrant, Mark McConaughey, Ronnie Lockwood, Samuel Brothers, David Ponthieux, Neal Scmitt, Harold Arrant, Carl Dunn, Matt Delcoure, Bryant Nugent, Shane Wink, Rickie Redding, Jason Bennett, Bryan Boudreaux, Ken Hasley, Jeff O'Bier, Richard Lockwood, and John Green all allege that they were prevented in some way from attending Union meetings. [Doc. No. 62, Exh. 1, Plaintiffs' discovery responses, Exh. E].  Although Stacy Robertson also alleged that he was prevented from attending Union meetings, Robertson has since withdrawn his retaliation claim.

meetings could have disseminated the information to other members.

Additionally, Jeselink explained that when they talked with Chief Bryant, he changed the policy, so that one truck from each district can attend the meetings. Jeselink admitted that firefighters outside their district could not respond as quickly as they could to any emergency if they were in their district.

Notably, in their opposition memorandum, Plaintiffs do nothing other than identify Chief Bryant's change of the location of the Union meetings. They do not argue or present any evidence related to claims that they were restricted in some way from attending Union meetings.

Based on a review of the record evidence, the Court finds that Plaintiffs' allegations regarding their attendance at and the location of Union meetings do not rise to the level of a materially adverse action that would quell a reasonable person's FLSA complaints. In fact, the undisputed evidence shows that Chief Bryant chose not to move the location of Union meetings and that he changed the policy on attendance at Union meetings after firefighters talked to him about the policies. The City's Motion for Partial Summary Judgment on this claimed act of retaliation is GRANTED.

### (2)    Telephone usage policy

In his deposition, Jeselink claimed that the City implemented a telephone usage policy, effective September 1, 2006, as an act of retaliation. The policy's stated purpose and scope was as follows:

> This Policy establishes guidelines for the appropriate usage of telephone equipment owned by the City of Monroe (the City), and outlines the expected recourse for documented misuse of such property and services. It applies to all full and part-time employees of the City, including hourly and salaried employees, regardless of the user's location. Equipment covered by this policy includes city owned PDA's, cellular hand held computers such as Blackberries and Treos, traditional wire line

> telephones, facsimile machines, modems, and cellular telephones. It supplements existing computing, internet and network equipment policies.

[Doc. No. 62, Exh. 2, Jeselink Depo., Exh. 2, p. 2, Sec. I]. The policy provides that "[t]he City's telephone systems are available for the conduct of official municipal business in the direct support of assigned duties and responsibilities of users, and the delivery of municipal services." [Doc. No. 62, Exh. 2, Jeselink Depo. Exh. 2, p. 2, Sec. II]. The policy calls for employees to "exercise common sense and good judgment in the personal use of telephone equipment," and states "personal use shall be reasonably brief and infrequent in nature, shall not adversely affect the work performance of the employee or those of the employees' work group, and shall not create the appearance of impropriety." [Doc. No. 62, Exh. 2, Jeselink Depo. Exh. 2, p. 2, Sec. II]. Additional provisions require users to comply with harassment policies and prohibit or discourage certain types of calls.

The City contends that the two-page telephone usage policy is, on its face, a reasonable regulation relating to use of City property and minimizing City expenses and is applicable to all City employees. The City argues that the implementation of the policy is not a materially adverse action and was not retaliatory. Plaintiffs have not responded to this argument.

The Court agrees with the City that the adoption of this facially neutral and reasonable telephone usage policy, applicable to all City employees, is not a materially adverse action. The City's Motion for Partial Summary Judgment on this claimed act of retaliation is GRANTED.

### (3)     Criminal background checks

Finally, the City argues that Plaintiffs have no evidence to support their claim that firefighters were subjected to retaliatory criminal background checks. Plaintiffs identified Randall McConaughey ("McConaughey") and Stacy Reynolds ("Reynolds") as persons where were affected by this alleged adverse action, but McConaughey denied that he had a criminal background check

-15-

claim, and Reynolds withdrew his entire retaliation claim. [Doc. No. 62, Exh. 3 McConaughey Depo., pp. 47-48, 53-54]. The City presented undisputed evidence from former Chief Investigator David Hill that criminal background checks were not run on current employees. Plaintiffs have not opposed the City's argument or evidence. Because Plaintiffs have failed to present evidence that this action was taken at all, they cannot show that they were subjected to a materially adverse action. Therefore, the City's Motion for Partial Summary Judgment on this claim is GRANTED.

### b. Causal Connection

The City argues that Plaintiffs have failed to establish a causal connection between their protected activities and the following alleged acts of retaliation: (1) prohibiting firefighters from trading shifts or time; (2) forcing firefighters to "step-up" or work shifts in place of a higher ranking member of the fire department; (3) forcing recently retired firefighters to forfeit earned vacation; (4) transferring the Union President, Vice-president, and Secretary-treasurer to less desirable positions and/or locations; (5) enforcement of the sick leave policy; and (6) rescission/attempted rescission of the CBA. The City contends that Plaintiffs have failed to present any evidence at all in support of their claim that the City conducted retaliatory criminal background checks.

Plaintiffs have provided the Court with a timeline of events which show the close timing between the protected activities and the alleged retaliatory acts. Plaintiffs also rely on statements by Chief Bryant and others to support these claims.

At the prima facie stage, "close timing between an employee's protected activity and an adverse action against [the employee] may provide the 'causal connection' required" to show that the protected activity was a motivating factor in the adverse actions. *Evans v. City of Houston*, 246 F.3d

344, 354 (5th Cir. 2001) (citing *Swanson v. Jen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)). The causal link required by the third prong does not rise to the level of a "but for" standard at the prima facie stage. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). "[A] time lapse of up to four months has been sufficient to satisfy the causal connection for summary judgment purposes." *Evans*, 246 F.3d at 354 (quoting *Weeks v. NationsBank, N.A.*, No. Civ. A. 3:98-CV-1352M, 2000 WL 341257 at *3 (N.D. Tex. March 30, 2000); *see also Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 995 (5th Cir. 2005); *cf. Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (holding that a five-month lapse, by itself, does not support an inference of a causal link); *Ajao v. Bed Bath and Beyond, Inc.*, 265 Fed. Appx. 258, 265 (5th Cir. 2008) (where plaintiff relied "solely" on the fact that the adverse action took place four months after he filed an EEOC charge, the Fifth Circuit held "temporal proximity . . . [was] not close enough, without additional supporting summary-judgment evidence, to establish a causal connection.").

Plaintiffs and the Union began complaining about FLSA issues in November 2005, sent letters from their retained legal counsel in January and February 2006, and, after continued negotiation efforts, filed suit in June 2006. Plaintiffs complain that Chief Bryant and the City began to subject them to retaliatory acts as early as April 2006. The City argues that Plaintiffs cannot establish the temporal element because they complained first in November 2005, more than four months before Chief Bryant's change to the time trading policy in April 2006. However, that argument ignores the facts in this case: Plaintiffs continued to complain of FLSA issues after November 2005 and began taking more aggressive steps to obtain a response from the City by retaining counsel who actively attempted to obtain a response from the City in January and February 2006, and who, after the events of April and May 2006, notified the City of Plaintiffs' intent to file

suit.  Further, Plaintiffs do not rely on the timing of Chief Bryant's actions alone to support their prima face case; they have pointed to statements evidencing his hostility to the firefighters' Union and admitting that he took at least one retaliatory action against the Union.  Given the timeline of events in this matter and the disputed evidence of hostility allegedly displayed by Chief Bryant, the Court finds that Plaintiffs have met their prima facie burden.

### c.    Pretext/Mixed Motive

Once Plaintiffs have met their prima facie burden, the City must produce legitimate, non-retaliatory reasons for each of the complained-of actions.  If the City's reasons explain "**both** the adverse action and the timing" of the action, then, in order to meet their burden on pretext, Plaintiffs "must offer some evidence from which the jury may infer that retaliation was the real motive." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (emphasis added).

Alternatively, under a mixed-motive theory, *see* [Doc. No. 109, p. 18], Plaintiffs can offer evidence that raises a genuine issue of material fact for trial whether retaliation was at least one of the motives for the complained-of actions.  *See Smith v. Xerox Corp.,* 584 F.Supp.2d 905, 912 (N.D. Tex. Oct. 31, 2008) (and cases cited therein); *see also Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004) (Under the modified *McDonnell Douglas* framework, once a plaintiff has established a prima facie case and the defendant has produced a legitimate, non-discriminatory reason for its action, then the plaintiff need only produce evidence sufficient to create a genuine issue of material fact "that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic.").[7]

---

[7]In their opposition memorandum, Plaintiffs argue, alternatively, that they can show mixed motive, even if they cannot show pretext.  The City does not address this contention in its

-18-

The Court now considers each action in turn to determine if the City has met their burden of production and, if so, if Plaintiffs have met their burden of proof to show pretext or mixed motive.

### (1)    Prohibiting firefighters from trading shifts or time

Trading shifts or "time trading" takes place when one firefighter substitutes his scheduled shift for that of another firefighter of the same rank or position.  It is undisputed that this practice is permitted by the FLSA and state law.  *See* 29 U.S.C. § 207(p)(3); La. Rev. Stat. 14:138B(2).  It is also undisputed that time trading has long been a practice of the MFD firefighters.  Finally, at least for purposes of summary judgment, it is undisputed, that the change in the time trading policy was materially adverse, at least to some firefighters. [Doc. No. 109, pp. 15-16 (examples of firefighters whose second jobs, educational opportunities, and attendance at children's or church

---

reply memorandum.  However, the Court notes that the Fifth Circuit has not directly addressed the issue whether the mixed-motive analysis applies to a retaliation claim under Title VII or the FLSA. *Cf. McCullough v. Houston Cty, Tex.*, 297 Fed.Appx. 282, 2008 WL 4613697, at *7 n. 7 (5th Cir. Oct.16, 2008) (The court has not "extended the holdings of either [*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) or] *Rachid*, so as to apply the mixed-motives analysis" to Title VII retaliation claims.) (citations omitted); *Block v. Kelly Servs., Inc.,* No. 05-20978, 197 Fed. Appx. 346, 348-49 (5th Cir. Sept. 7, 2006) (In a Title VII retaliation claim, if the employer meets its burden of production, then "the burden returns to Block to prove the proffered reason was a pretext, or, although not pretext, was only one of the reasons she was fired, another being her protected activity.") (citing *Rachid*, 376 F.3d at 312).

This Court agrees with the other district courts who have examined the issue and determined that "(1) a mixed motive theory can apply in Title VII retaliation claims, and (2) a Title VII retaliation mixed motive case does not require direct evidence, but can be raised by circumstantial evidence." *Smith,* 584 F.Supp.2d at 912 (and cases cited therein); *see also Martin v. UT Southwestern Med. Ctr.*, 2009 WL 77871 (N.D. Tex., Jan. 12, 2009) (citing *Smith*). Further, because Title VII case law is instructive in the FLSA context, the Court also finds that the mixed-motive analysis would apply to a FLSA retaliation claim.  *See Aguirre v. SBC Commc'ns, Inc.*, Civil Action No. H-05-3198, 2007 WL 2900577, at * 27 (S.D. Tex., Sept. 30, 2007); *see also Richardson v. Monitronics Int'l, Inc.,* 434 F.3d 327 (5th Cir. 2005) (extending *Rachid* to retaliation claims under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-53).

activities were affected)].

As Jeselink admits, Chief Bryant has opposed time trading since he became Fire Chief in July 1998. [Doc. No. 109, Exh. 28, p. 85]. Chief Bryant testified that he opposes time trading because he believes that firefighters do not gain the experience they need and lose the opportunity to train with their crews and to establish relationships. [Doc. No. 62, Exh. 6, Rule 30(b)(6) Depo., p. 92]. Although Chief Bryant announced his intent to limit time trading shortly after he became Fire Chief, he later agreed that he would not immediately take action with regard to that policy. [Doc. No. 62, Exh. 4, Chief Bryant Depo., pp. 54-55].

In August or September 2004, Chief Bryant reiterated to Jeselink that time trading was "off the table." [Doc. No. 109, Exh. 28, Jeselink Depo., p. 85]. Jeselink interpreted that statement to mean that there would not be a change in the time trading policy. According to Chief Bryant, he did not impose time trading restrictions at that time because there was some doubt that a sales tax meant to increase firefighters' salaries would pass.

In April 2005, the sales tax did pass, and the salaries of firefighters increased significantly (by approximately forty percent). Chief Bryant testified that he waited until one year later, in April 2006, to impose time trading restrictions, in order to allow firefighters to adjust to the change and that he would have done so regardless of Plaintiffs' FLSA claims.

Thus, the City has produced a legitimate, non-retaliatory reason for Chief Bryant's opposition to time trading and change to the policy and an explanation of the timing of the action.

Jeselink's testimony, offered as rebuttal evidence, does not raise a genuine issue of material fact for trial. Although he believed Chief Bryant intended to withdraw the time trading

issue from consideration at all, he does not dispute that Chief Bryant had a long-standing position against time trading. Further, Chief Bryant's explanation for waiting until April 2006 to change the policy has not been rebutted. While the Court has found that Chief Bryant allegedly expressed some animus to the Union and even allegedly admitted one act of retaliation, those findings do not mean that every act of retaliation alleged automatically goes to trial. On this claim, despite the alleged harm to Plaintiffs, Plaintiffs have failed to raise a genuine issue of material fact that the City's change in the MFD time trading policy was pretext for or was partially motivated by retaliation for Plaintiffs' FLSA-protected activities. Accordingly, the City's Motion for Partial Summary Judgment is GRANTED on this alleged act.

### (2)    Forcing firefighters to "step-up"

"Step-up" or "acting out of class" means one firefighter of the next lower rank would be called to "step-up" a rank and act temporarily for an absent firefighter of the next higher rank, at the pay scale of the absent firefighter. It is undisputed that step-up pay is less than properly paid overtime pay.

Chief Bryant testified that he believed in 2006 at the time he instituted a change in policy that firefighters were refusing to accept step-up assignments to force the City to use firefighters on overtime. [Doc. No. 62, Exh. 4, Chief Bryant Depo., pp. 73-74]. Testimony from two Plaintiffs supported Chief Bryant's belief. Plaintiff Neil Schmitt admitted that he was aware of the practice of refusing step-up assignments to try to "even out overtime." [Doc. No. 62, Exh. 7, Neil Schmitt Depo., p. 34]. Plaintiff and Deputy Chief D. Finkbeiner also

admitted that he was familiar with the practice and that it cost the City more to pay higher ranking individuals overtime. [Doc. No. 62, Exh. 8, D. Finkbeiner Depo., pp. 29-30].

However, Chief Bryant says that refusal of step-up assignments is no longer a problem, so he withdrew this policy.[8]

The City has offered legitimate, non-retaliatory reasons for the step-up policy, and Plaintiffs have presented the Court with no specific evidence to dispute the City's explanation for the policy or the timing of the policy, and, thus, they have failed to establish that the city's explanation is pretextual or motivated in part by retaliation. The City's Motion for Partial Summary Judgment on this alleged act of retaliation is GRANTED.

### (3)     Forcing recently retired firefighters to forfeit earned vacation

Firefighters' entitlement to vacation is addressed both by statute and under the CBA. Under La. Rev. Stat. 33:1996, firefighters are entitled to "annual vacation of eighteen days with full pay." The statute further provides that the vacation period is "increased one day for each year of service over ten years, up to a maximum vacation period of thirty days." La. Rev. Stat. 33:1996. The most recent CBA provides that, in pertinent part :

---

[8]Chief Bryant's statement is confusing. If firefighters were not permitted to refuse a step-up assignment, then, of course, there is no problem with firefighters refusing step ups.

> . . . Vacations shall be allotted each employee as
> follows: first thru fourth anniversary date of continuous
> service - 9 shifts; fifth thru ninth anniversary date
> continuous service - 11 shifts; tenth thru fourteenth
> anniversary date of continuous service - 14 shifts;
> fifteen years and above of continuous service - 16
> shifts.  Unused vacation days may accumulate for a
> maximum of 40 shifts (960 hours) and be treated the
> same as prescribed in the City of Monroe Employee
> Handbook. . .

[Doc. No. 62, Exh. 16, Steve Nealy Depo., Exh. 1, pp. 3-4, ¶X].

Chief Bryant explained in January 3, 2007 correspondence to the Union, the MFD's method for determining vacation days for retiring firefighters:

> <u>Vacation days when retiring</u>
> <u>Members are awarded days/shifts based on their</u>
> <u>anniversary date</u>.  This works the same as a salary.
> For example if you work Monday through Friday and
> are paid 100 per day the total is $500.00 however, if
> you miss a day you only receive the amount worked.
> Another Example: If a member gets twelve shifts for
> his/her anniversary date <u>but chooses to leave early</u>
> <u>then his time will be prorated based on the number of</u>
> <u>months actually worked</u>.

[Doc. No. 62, Exh. 4, Chief Bryant Depo., Exh. 12, p. 2, ¶II].   According to the City, Plaintiffs complain about the proration policy as explained in Chief Bryant's correspondence because the vacation time accumulates on the anniversary date of employment, rather than on a yearly basis.

However, whether or not the City's calculation of vacation pay for retiring

firefighters is correct,[9] Plaintiffs have presented no evidence showing that the City's basis for that calculation is pretext for or motivated by retaliation. In fact, the City points to deposition testimony by two Plaintiffs, Harold Bruce Moore and Edgar Wink, in which they admit that they do not believe that Chief Bryant retaliated against them. [Doc .No. 62, Exh. 14, Harold Bruce Moore Depo., pp. 19, 29; Exh. 15, Edgar Wink Depo., p. 19].

The City's Motion for Partial Summary Judgment on this alleged act of retaliation is GRANTED.

### (4) Transferring the Union President, Vice-president, and Secretary-treasurer to less desirable positions and/or locations

It is undisputed that on May 1, 2006, Chief Bryant transferred Jeselink, Dickerson, and McConaughey to different positions and locations. The transfer took place six months after they first complained about FLSA issues, two months after the last letter from their attorney, and the month before they filed suit. Chief Bryant testified that Jeselink, Dickerson, and McConaughey were transferred because of their "attitude." [Doc. No. 62, Exh. 4, Chief Bryant Depo., pp. 58-60]. He alleged that Jeselink "would turn his back when members of administration would come to work" and would speak "[v]ery little." He alleged that Dickerson "routinely made comments in the fire station - the cocksucker, motherfucker and all this type of stuff." [Doc. No. 62, Exh. 4,

---

[9]The Court has not considered whether the calculation by the City is correct under the statute.

Chief Bryant Depo., pp. 58-60]. Chief Bryant also said that McConaughey engaged in "negative talk." [Doc. No. 62, Exh. 4, Chief Bryant Depo., pp. 59-60]. On May 1st, Chief Bryant also transferred thirty other people "due to promotions, member complacency, inactivity and moral decline." [Doc. No. 62, Exh. 4, Chief Bryant Depo., Exh. 6, for incomplete transfer list; Ex. 2, Jeselink Depo., p.25, Exh. 7, for complete transfer list]. He denies that the Jeselink, Dickerson, and McConaughey transfers were disciplinary and points out that Dickerson was later promoted.

In response, Plaintiffs provide specific evidence of the nature of the transfers of each employee. Prior to his transfer, Jeselink served as EMS/Safety Supervisor on Med 1 and was stationed at a multi-truck station. [Doc. No. 109, Exh. 24, Jeselink Declaration]. Jeselink had been provided with specialized training in order to provide emergency medical services for serious calls, such as cardiac arrest, house fires, automobile accidents, and hazardous materials. Jeselink had the discretion to determine if calls required specialized medical services and to travel to those calls, even if he were not dispatched. In this position, Jeselink was on the Med 1 truck alone, reported directly to a deputy chief, and did not fight fires. Chief Bryant transferred Jeselink to an engine company at a single truck station where he reports to a district chief and is required to fight fires.

Chief Bryant also transferred McConaughey from Med 1 to an engine company with the same changes in working conditions as Jeselink.

Chief Bryant transferred Dickerson from Engine 102 to Engine 109 without consuulting him. Dickerson's deputy chief told him that Chief Bryant wanted him moved. [Doc. No. 109, Exh. 10, Dickerson Depo., pp. 44-46].

In addition, the Court has considered other factors. The City's evidence of prior transfers and the later promotion of Dickerson is not dispositive. The record shows that promotions were made on the basis of civil service examinations and seniority, not a subjective evaluation of an employee's skills by Chief Bryant. Likewise, prior transfers of these or other employees is not evidence that these transfers, to less desirable positions or locations, were not retaliatory. Finally, the Court cannot ignore the fact that Chief Bryant transferred the three top officers of the Union on the same day.

Based on the record evidence, the Court finds that Plaintiffs have raised a genuine issue of material fact for trial that the reasons given for the transfers of Jeselink, Dickerson, and McConaughey were pretext for retaliation. The City's Motion for Partial Summary Judgment on this alleged act of retaliation is DENIED.

### (5) Enforcement of the sick leave policy

Plaintiffs also contend that the City retaliated against them by enforcing its 2001 sick leave policy. In a June 26, 2007 memo to "All Personnel," Chief Bryant stated as follows:

> This is to advise that in the past few years our sick leave policy has not been followed as strictly as perhaps it should have been. Please note that henceforth the sick leave policy will be adhered to strictly. If you have any concerns or questions please talk to your immediate superior first but if you still have questions, know that my door is always open.

[Doc. No. 62, Exh. 4, Chief Bryant Depo., Exh. 14]. Plaintiffs contend that the sick leave policy was not enforced prior to this time and that Chief Bryant only began enforcing the policy in June 2007 in retaliation for the filing of the lawsuit.

Under La. Rev. Stat. 33:1995, firefighters are "entitled to full pay during sickness or

incapacity not brought about by his own negligence or culpable indiscretion for a period of not less than fifty-two weeks."  Under the MFD policy, an employee on sick leave shall remain in his or her residence or place of confinement for the entire sick leave period except to visit a physician, hospital or clinic for treatment; to purchase medicine; to purchase food or meals at their place of confinement; to vote; or to engage in specifically approved limited activity. [Doc. No. 62, Exh. 2, Jeselink Depo., Exh. 16].  Both Chief Bryant and Deputy Chief D. Finkbeiner testified that, in the time period before Chief Bryant issued his memo, there was increased abuse.  [Doc. No. 62, Exh. 4, Chief Bryant Depo., pp. 76-77; Doc. No. 62, Exh. 8, D. Finkbeiner Depo., pp. 26-27; Doc. 41, ¶19; Ex.  8, p. 13].  For example, Chief Bryant pointed out that employees were doing such things as skiing, building houses, and taking care of horses.

In response, Plaintiffs rely on the testimony of Wayne Duke ("Duke").  Duke testified that, after he suffered a broken elbow on June 23, 2007, and took sick leave, he was denied permission to get a part to fix his toilet.  According to Duke, Chief Bryant asked how Duke was going to repair a toilet with a broken elbow.  Although Duke explained that he was going to have his seven-year-old son actually install the part, Chief Bryant denied him permission.  Duke, who is a single parent, was also denied permission to take his son to see his grandmother or to get his hair cut.  [Doc. No. 109, Exh. 21, Duke Depo., p. 5].

A month later, on July 22nd, Duke was given permission to visit his mother; on July 25th he was given permission to have his son's hair cut; and on July 27th, all restrictions were lifted. [Doc. No. 121, Exh. 4, Duke Depo., pp. 18, 29].

The City has provided an explanation for both the enforcement of the sick leave policy and

the timing of that enforcement. Thus, Plaintiffs were required to offer evidence from which the

jury may infer that retaliation was the motive (pretext) or was at least one of the motives (mixed

motive) for the enforcement of the policy. The evidence offered places the Court in a dilemma.

Duke's testimony does not provide evidence that Chief Bryant's decision to (or announcement of

the decision to) enforce the policy was pretext for retaliation or partially motivated by a retaliatory

motive.[10] However, Duke's testimony does raise a genuine issue of material fact for trial whether

Chief Bryant's application of the policy to him was based on an honest desire to curb abuses,

rather than a desire to retaliate against one of the FLSA Plaintiffs. The City places weight on the

fact that Duke's restrictions were lifted one month later. However, the lifting of the restrictions

only raises more questions in the Court's mind. If such a strict enforcement of the policy was

necessary to curb abuses, then why did Chief Bryant reverse himself without explanation?

Further, why were Duke's restrictions completely lifted? Based on Chief Bryant's unreasonable

refusal to allow Duke to do simple and/or necessary tasks and his unexplained reversal of that

refusal a month later, the jury could infer that Chief Bryant's true intent was not to enforce the

sick leave policy, but to retaliate against Duke.

While Plaintiffs contend that Duke's treatment was only one "example," the Court has not

been provided with other examples. Accordingly, the City's Motion for Partial Summary

Judgment on the enforcement of the sick leave policy is GRANTED IN PART and DENIED IN

---

[10]Six months prior to issuance of his memo, in January 2007, Chief Bryant had sinus surgery and avers that he adhered to the same strict sick leave policy. Specifically, he states that any time he left his "place of convalescence" he notified dispatch. [Doc. No. 121, Exh. 1, ¶ 22]. Of course, unlike the firefighters below him, Chief Bryant did not have to obtain permission each time he left.

PART. Plaintiffs have not raised a genuine issue of material fact for trial on the enforcement of the sick leave policy generally, but Plaintiff Wayne Duke has raised a genuine issue of material fact for trial based on the application of the policy to him. The Court's ruling is subject to reconsideration, should Plaintiffs present evidence regarding enforcement of the policy as to other individual Plaintiffs.

### (6)      Rescission/attempted rescission of the CBA

On May 10, 2007, the City Council passed an ordinance approving the proposed CBA with the Union for 2007-2008. Mayor Jamie Mayo signed the CBA on May 14, 2007. Despite the passage of six months, the Union had not signed the CBA in October 2007.

That month, on October 17th, the Office of the Legislative Auditor for the State of Louisiana issued an audit report, which questioned the legality of the holiday pay provisions contained in the 2002-2003 CBA. The same holiday provisions had been carried forward without change in the proposed 2007-2008 CBA.

The City and the Ouachita Parish Police Jury, which also had a CBA with the Union, requested an attorney general's opinion on the holiday pay issue. While waiting for the opinion to issue, the City Council was advised that the proposed CBA did not have a severability clause. The City Council was also advised that the ordinance approving the proposed 2007-2008 CBA did not have a deadline for signing the agreement. The members felt that there should be a deadline for the Union to sign within a certain period of time and that, if the Union did not meet the deadline, the proposed CBA should be void.

On October 23, 2007, the City Council met. At that time, the City Council voted to rescind the prior ordinance approving the proposed CBA, so that the City and the Union would need to re-

negotiate a CBA.  Additionally, because the 2002-2003 CBA also lacked a severability clause and the City wanted to ensure that it was not a party to a possibly illegal contract, the City Council also approved a termination ordinance for the 2002-2003 CBA.

Plaintiffs initially argued that Chief Bryant's alleged August 22, 2006 statement to Jeselink that "the Union is jeopardizing its contract by pushing these issues" was direct evidence of retaliation.  The Court rejected that argument, but the Court can consider Chief Bryant's statement as circumstantial evidence of retaliation.  Additionally, it is undisputed that the Attorney General has since issued an opinion finding that the holiday pay provisions are legal, but, on April 14, 2008, the City again refused to reinstate the CBA.  The Court has been provided with no explanation for that latest refusal in Mayor Mayo's affidavit or otherwise.

Under these circumstances, the Court finds that Plaintiffs have presented a genuine issue of material fact for trial whether the City retaliated against them by rescinding and refusing to reinstate the CBA.  The City's Motion for Summary Judgment on this alleged act of retaliation is DENIED.

### c.    Other Claims

The City also moves for summary judgment on several other claims which were not listed in Plaintiffs' Third Amended Complaint.

### (1)    City's Counterclaim

Plaintiffs also allege that the City has retaliated against them by filing a spurious counterclaim seeking repayment of $980,000.00. [Doc. No. 109, pp. 4, 17 (claim is without "basis in law or fact").  In its Reply, the City states that its counterclaim is authorized under Louisiana law, but points out that, "[i]n any event, [P]laintiffs did not allege the counterclaim was a retaliatory act, and it was not addressed in the motion presently at issue." [Doc. No. 121].

-30-

The City asserted a counterclaim in its original Answer filed on August 24, 2006 [Doc. No. 3]. On August 29, 2006, Plaintiffs answered the counterclaim and asserted as a defense that the counterclaim was "not warranted by existing law and is presented for improper purposes, including harassment, in violation of FED. R. CIV. P. 11. Plaintiffs . . . are entitled to attorneys' fees and costs pursuant to FED. R. CIV. P. 11(C)(2)." [Doc. No. 6]. However, Plaintiffs' answer did not identify the counterclaim as an act of retaliation under the FLSA.

Plaintiffs were granted leave to amend their Complaint three times, on August 30, 2006, January 29, 2007, and January 15, 2008. *See* [Doc. Nos. 7, 11, & 41]. Plaintiffs first asserted a FLSA retaliation claim in their January 29, 2007 Second Amended Complaint, but did not list the City's counterclaim in the acts of retaliation. [Doc. No. 11, ¶ 20 (The City's "course of retaliation includes, but is not limited to" seven identified acts.)]. On March 30, 2007, Plaintiffs filed a Motion to Dismiss Counterclaim, but did not put the City on notice that they contended this counterclaim was an act of retaliation under the FLSA. [Doc. No. 15]. Even in their January 15, 2008 Third Amended Complaint, Plaintiffs failed to identify the City's counterclaim as an act of retaliation. [Doc. No. 41, ¶ 20 (The City's "course of retaliation includes, but is not limited to" eight identified acts.)].

Federal Rule of Civil Procedure Rule 8(a)(2) requires that a plaintiff recite a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) . To comply with Rule 8, a plaintiff's statement of his claim "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Gen. Elec. Capital Corp. v. Posey*, 415 F.3d

391, 396 (5th Cir. 2005) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (other citations omitted)).  "Whether a complaint gives reasonable notice of a claim is a 'pure question of law.'" *Bejil v. Ethicon, Inc.*, 269 F.3d 477, 481 (5th Cir. 2001) (citing *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 964 n. 2 (11th Cir. 1997)).

It is clear that the City had adequate notice that Plaintiffs are asserting retaliation as a cause of action under the FLSA.  However, after reviewing Plaintiffs' complaint and the record the Court finds that, despite ample opportunity, Plaintiffs did not plead or otherwise give the City notice that they intended to rely on the City's counterclaim to support its retaliation claim. Therefore, Plaintiffs cannot rely on the City's counterclaim as a basis for its FLSA retaliation claim.[11]

### (2)    Removal of personal items from fire stations

Although not listed as an act of retaliation in any of the complaints in this matter, Plaintiffs did raise the removal of personal furniture and appliances from the fire stations in discovery, specifically, the deposition of Jeselink.

The City contends that Chief Bryant addressed this alleged act of retaliation in his affidavit.  He explained that the use of personal furniture had resulted in the City's furniture being improperly stored in engine rooms and that the use of personal appliances caused electrical overloads. [Doc. No. 121, Exh. 1, ¶¶ 24-25].

First, as with the alleged retaliatory lock downs, this action has greater significance to firefighters who work twenty-four-hour shifts than it might to a typical office worker.  Plaintiffs describe the

---

[11]If Plaintiffs can produce evidence that the City was notified through the discovery process that Plaintiffs were asserting the counterclaim as an alleged retaliatory act, then the Court will revisit this issue.  There is no such evidence before the Court at this time, however. *See* [Doc. No. 62, Exh. 1, Plaintiffs' discovery responses].

furniture purchased by the City as that typically found in a medical office, i.e., uncomfortable. The use of personal appliances and comfortable furniture is significant to someone working a twenty-four-hour shift. Second, Chief Bryant took this action only one month after Plaintiffs filed their lawsuit. Given the close temporal proximity and other circumstantial evidence of Chief Bryant's animus, the Court finds that Plaintiffs have raised a genuine issue of material fact for trial whether this action was materially adverse, causally connected to their protected activity, and whether Chief Bryant's explanation was pretext for retaliation. Accordingly, the City's Motion for Partial Summary Judgment on this alleged act of retaliation is DENIED.

### (3)  Failure to pay overtime

In their opposition memorandum, Plaintiffs state that the City is failing to pay overtime compensation in retaliation for their FLSA-protected activities. This statement appears to be tied to their CBA rescission claim. [Doc. No. 109, p. 17]. If so, the Court has resolved that claim as set forth above. To the extent, however, that Plaintiffs attempt to assert a claim based on the separate retaliatory act of failing to pay overtime compensation, the Court agrees with the City that Plaintiffs have failed to plead or otherwise give timely notice to the City of this claim. Thus, Plaintiffs cannot rely on the City's failure to pay overtime compensation as a basis for its FLSA retaliation claim.[12] To the extent that Plaintiffs attempt to assert the City's failure to pay overtime compensation as a separate act of retaliation, the City's Motion for Partial Summary Judgment is GRANTED.

### (4)  Remaining retaliation claims of Randall McConaughey

In addition to his complaints about time trading, sick leave and transfer, addressed above,

---

[12]Obviously, Plaintiffs have pled a FLSA claim and can recover if they can prove that the City failed to pay overtime compensation correctly.

McConaughey alleges that he was "singled out" for possible violation of law regarding dual public employment and that he was suspended for fifty days for his actions involving a domestic dispute between his ex-wife and son. [Doc. No. 121, Exh. 3, McConaughey Depo., p. 9].

Dual public employment is prohibited by La. Rev. Stat. 42:61, *et. seq.* Louisiana Revised Statute 42:63E provides as follows:

> No person holding a full-time appointment office or full-time employment in the government of this state or a political subdivision thereof shall at the same time hold another full-time appointment office or full-time employment in the government of the state of Louisiana, in the government of a political subdivision thereof, or in a combination of these.

McConaughey worked full time for the Louisiana State Board of Cosmetology ("the Board") and the MFD. The City has presented undisputed evidence that Chief Bryant received correspondence dated September 12, 2007, and October 4, 2007, from the Board indicating that McConaughey appeared to hold two governmental jobs and asking for his work schedule for 2007. [Doc. No. 62, Exh. 3, McConaughey Depo., Exhs. 2 & 3]. McConaughey admitted he did not know whether Chief Bryant "initiated a contact with the Board . . . or whether the Board . . . sent [Chief Bryant] a letter." [Doc. No. 62, Exh. 3, McConaughey Depo., p. 13].

The City argues that Chief Bryant's cooperation in the investigation of conduct prohibited by law is not a retaliatory act. Plaintiffs have not opposed this argument. The Court agrees with the City that Plaintiffs have failed to meet their burden on this claim.

McConaughey also claims retaliation because he received a 50-day suspension for an incident in which he took a MFD vehicle, using lights and siren, while on duty, to respond to a private domestic dispute between his ex-wife and son. [Doc. No. 62, Exh. 3, McConaughey Depo., pp. 8, 15-20]. McConaughey admits that this matter was reviewed by the MFD disciplinary board, which was

comprised of seven voting members and included a Plaintiff in this matter, Bryan Nugent. [Doc. No. 62, Exh. 3, McConaughey Depo., pp. 23-24]. Although the MFD disciplinary board recommended that he be suspended for 90 days, Chief Bryant reduced the suspension to 50 days. McConaughey also admitted that Chief May, who is not a Plaintiff, was also suspended, as a result of his role in the incident. [Doc. No. 62, Exh. 3, pp. 18, 26-27].

Plaintiffs have not opposed the City's evidence or argument on this matter, and the Court, again, agrees with the City that Plaintiffs have failed to meet their burden on this claim as well. Accordingly, the City's Motion for Partial Summary Judgment on McConaughey's claims of retaliation based on Chief Bryant's involvement in his dual employment and his suspension is GRANTED.

## III. CONCLUSION

For the foregoing reasons, the City's Third Motion for Partial Summary Judgment [Doc. No. 62] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Plaintiffs' retaliation claims based on criminal background checks; restrictions on the location of and attendance at Union meetings; the telephone usage policy; the time trading policy; enforcement of the sick leave policy, except as to the claim of Plaintiff Wayne Duke (and subject to reconsideration); forfeiture of earned vacation by retired firefighters; and McConaughey's claims based on his dual employment and his suspension. The Court finds the City has failed to carry its burden of proof, and summary judgment is DENIED as to Plaintiffs' retaliation claims based on the lockdown policy; the transfers of Jeselink, Dickerson, and McConaughey; the rescission of the CBA; and the removal of furniture and personal appliances from the fire stations. Plaintiffs' retaliation claims based on the City's counterclaim and based on the City's alleged failure to pay overtime compensation were not pled and are not properly before the Court.

MONROE, LOUISIANA, this 17th day of March, 2009.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE